UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SOMCHAI SUWANPHANU,

                Plaintiff,

– against –

THE MOUNT SINAI HEALTH SYSTEM,
INC. d/b/a ST. LUKE'S–ROOSEVELT
HOSPITAL CENTER and THE ST. LUKE'S
–ROOSEVELT HOSPITAL CENTER c/o
MOUNT SINAI HOSPITAL GROUP,

                Defendants.

**OPINION & ORDER**

16 Civ. 2896 (ER)

Ramos, D.J.:

    Somchai Suwanphanu worked at Mount Sinai St. Luke's–Roosevelt Hospital transporting patients within the hospital. He was fired for allegedly falsifying hospital records when he reported two patient transportation jobs as "Complete" despite the fact that he had not actually completed them. Suspecting the real reason for his termination was his recent complaints about unpaid regular and overtime wages, Suwanphanu filed a lawsuit under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206(a), 207(a), 215 and the New York Labor Law ("NYLL") §§ 215, 663, alleging failure to pay overtime compensation, failure to pay wages, and unlawful retaliation for making his complaints. Amended Compl., Doc. 10.

    Although Suwanphanu makes a prima facie case that his firing was in retaliation for his complaints about unpaid wages and overtime, a review of the record evidence shows that he is unable to offer evidence sufficient to rebut Mount Sinai's valid reason for his termination. Accordingly, the Court GRANTS the hospital's motion for partial summary judgment as to the state and federal retaliation claims, as well as any claims arising from non-payment of overtime wages.

I.   BACKGROUND

Suwanphanu had worked for Mount Sinai St. Luke's–Roosevelt Hospital as a patient transporter for eight years by June 2015. Defs.' Statement of Undisputed Material Facts ("Defs.' SMF") ¶ 1, Doc. 51. His role at the hospital was to respond to jobs assigned to him by a dispatch system called "TeleTracking," report to the area where a patient was awaiting pickup, and transport the patient to the appropriate destination, ensuring that the patient was left in the care of the appropriate medical staff. *Id.* ¶¶ 6–7, 9–11. He worked five days per week, normally for 7.5 hours per day, from 3:00 p.m. to 11:00 p.m. *Id.* ¶ 2; Defs.' SMF Ex. B ¶ 6. Like all hourly employees, on weeks when he worked more than 40 hours, he was entitled to receive an overtime wage. *See* 29 U.S.C. § 207(a). Suwanphanu was paid weekly. *See, e.g.*, Defs.' SMF Ex. A ("Suwanphanu Dep.") Ex. 20 ("May 28 Paycheck").

### A. Suwanphanu's Paychecks

During a five-week period in May and June of 2015, Suwanphanu noticed errors in four of his paychecks. As described below, the errors built upon each other. The May 28 paycheck paid him for 7.5 hours of sick leave that he had not taken. *See* May 28 Paycheck. The June 4 paycheck failed to pay him for a day he had indeed worked. *See* Suwanphanu Dep. Ex. 22 ("June 4 Paycheck"). The June 11 paycheck removed 7.5 hours of sick pay from his wages. *See* Suwanphanu Dep. Ex. 23 ("June 11 Paycheck"). And the June 25 paycheck had two issues: it removed 7.5 hours of sick pay from his wages, and it paid him for 45 hours of work but did not pay him the overtime rate for the five hours of work above 40 hours. *See* Suwanphanu Dep. Ex. 21 ("June 25 Paycheck").[1]

---

[1] Suwanphanu admits now, however, that he only worked 37.5 hours for the week reflected in the June 25 paycheck — not 45 hours. Suwanphanu Dep. 158:25–159:14.

Suwanphanu spoke with his manager, Imani Oliver, as he noticed each error. In total, he spoke with her at least three times in her office about the errors, with the latest meeting taking place on June 30. Defs.' SMF ¶ 66. Each time they spoke, Oliver told Suwanphanu that she would take care of the issues. *Id.* Oliver fixed the extra sick pay Suwanphanu had received on the May 28 paycheck by deducting 7.5 hours of sick pay from the June 11 paycheck. She took care of the missing day of regular pay from the June 4 paycheck by writing on it, "He will see an extra 7.5 Reg Pay Check on 6/25." Suwanphanu Dep. Ex. 19. Suwanphan did receive this extra 7.5 hours of regular pay on his June 25 paycheck; it was the reason he had over 40 hours of regular pay listed on that check even though he did not work more than 37.5 hours during that week. Although Suwanphanu was seemingly compensated correctly after these two fixes, the hospital does not explain why it deducted *another* 7.5 hours of sick pay on the June 25 paycheck, leaving Suwanphanu presumably underpaid by 7.5 hours at the sick pay rate.

In addition to speaking with his direct manager, Oliver, Suwanphanu spoke with two others: a director named Rubiela Guzman, and Yvette Torres, the executive assistant to the hospital's president. Defs.' SMF ¶¶ 65, 78. In his meeting with Guzman in late June, Guzman indicated that she would discuss the issue further with Oliver. *Id.* ¶ 65. Torres, with whom Suwanphanu spoke after talking to Guzman, called someone on the phone in Suwanphanu's presence and said that she was with an employee complaining about not being paid. *Id.* ¶ 77, 85. Suwanphanu heard the person at the other end, whom he believed to be Oliver, say that she would take care of it. *Id.* ¶ 85. After Suwanphanu spoke with Guzman and Torres, Oliver reprimanded him for reporting the errors to the other two women. Suwanphanu Dep. 108:23–109:11.

### B. The Transporter Incidents

Suwanphanu's job revolved around a TeleTracking system that assigned and recorded patient transport jobs. Defs.' SMF ¶ 9. Suwanphanu would receive an assignment via pager, on which he would input codes indicating acknolwedgment of the job, completion of the job, and other status updates. *Id.* ¶ 10. The hospital indicates that Suwanphanu was responsible for notifying attendants if a job was incorrect and then waiting for a corrected job to come through before moving the patient. *Id.* ¶ 12. He was also responsible for canceling a job if the patient was to be moved by another staff member — like a nurse or physician — or a non-employee. *Id.* ¶ 13. Suwanphanu was aware of these rules. *Id.* ¶ 15.

During this time, the hospital had a Falsification of Records policy that provided that an employee "who makes a false statement, a misleading omission, enters false information, or forges any signature in any type of Hospital Center records, . . . , shall be subject to immediate disciplinary action, up to and including discharge." Defs.' SMF ¶ 16. The hospital maintains that entering false information into the TeleTracking system falls under the Falsification of Records policy and is grounds for discharge. *Id.* ¶ 17.

On June 24, 2015, Suwanphanu was involved in two incidents that led to his termination. Defs.' SMF ¶ 19. According to the records of the TeleTracking system, Suwanphanu accepted a job to transport a patient at 7:53 p.m. *Id.* He reported to the tracking system that he started the job at 8:00 p.m. and that he completed it at 8:11 p.m. *Id.* But, by his own admission, he did not move the patient himself; rather, the patient's husband moved the patient. Pl.'s Statement of Material Facts ("Pl.'s SMF") ¶ 3, Doc. 54. Suwanphanu claims that he informed a call center of the change and received approval from the nurse-in-charge. *Id.*

The second incident occurred about twenty minutes later. At 8:31 p.m., Suwanphanu was assigned a job that he marked as starting at 8:35 p.m. Defs.' SMF ¶ 24. He marked the job as

4

completed at 9:00 p.m. after indicating there had been a patient-related delay. *Id.* This job required for him to move a patient from one location on the tenth floor to the surgery unit, also on the tenth floor *Id.* During this period, a nursing assistant moved the patient from the eighth floor to the tenth floor. Def.'s Responses to Pl.'s SMF ¶ 4, Doc. 58. The nursing assistant indicated that she dropped off the patient at about 8:45 p.m. — ten minutes after Suwanphanu reported that he started the job. *Id.* From the tenth floor, Suwanphanu picked up the patient and delivered him to the lobby for discharge, rather than to the surgery unit. *Id.* ¶ 25.

Soon afterwards, Guzman learned of these incidents and asked Oliver to collect information. Defs.' SMF ¶¶ 27, 30. Oliver spoke with the nursing assistant, and she collected patient-transport logs related to the movement of these two patients. *Id.* ¶ 30. Guzman contacted the hospital's Human Resources Department and convened a fact-finding conference on July 2, 2015. *Id.* ¶ 37. Suwanphanu was present at the conference, although the parties dispute precisely what he said. *See id.* ¶¶ 37–40; Pl.'s SMF, Responses to Defs.' ¶¶ 37–40. At the very least, he admitted that he had not moved the first patient after reporting in the TeleTracking system that he had. Defs.' SMF ¶ 37. Immediately after the conference, Guzman made the decision to suspend Suwanphanu and got the approval of Human Resources before telling Suwanphanu of her decision. *Id.* ¶ 41; Pl.'s SMF ¶ 6. A week after the fact-finding conference, Guzman, in consultation with Human Resources, terminated Suwanphanu for "fail[ure] to comply with the hospital policy regarding Falsification of Hospital Center records." Defs.' SMF ¶¶ 44, 45.

One month later, in August 2015, Suwanphanu's union filed a formal grievance on his behalf. Defs.' SMF ¶ 46. Suwanphanu was present at the grievance hearing. After the hearing officer heard from Suwanphanu and considered statements made by the nursing assistant

involved with the second transport job, the hearing officer denied the grievance. *Id.* ¶¶ 56, 57. The hearing officer has testified that she was aware that Suwanphanu had made some complaints about payroll, but she insisted that her focus in the hearing was on the potential falsification of hospital records. *Id.* ¶ 54. Suwanphanu and the hearing officer never discussed the payroll issues; nor were they brought up during the grievance hearing. *Id.* ¶ 55.

Although Suwanphanu asked his union to file an arbitration claim on his behalf, the union declined to do so, indicating that it had "made a thorough investigation of [the] grievance and concluded that it does not warrant arbitration." Defs.' SMF ¶ 60. The union's Hearing and Appeals Board agreed, noting that it had "concluded that there is virtually no likelihood of succeeding at arbitration." *Id.* ¶ 61. The complaint in this case was filed six months later, in April 2016.

## II. RELEVANT LAW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* (internal quotation marks omitted). The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

6

The FLSA forbids "any person" from "discharg[ing] or in any other manner discriminat[ing] against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter . . . ." 29 U.S.C. § 215(a)(3). "FLSA retaliation claims are subject to the three-step burden-shifting framework established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)." *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010). Under this framework, "[t]he plaintiff has the initial burden to present a *prima facie* case of discrimination;" "[t]hen, the defendant has a burden of production to articulate some legitimate, nondiscriminatory reason for the adverse action;" and "[f]inally, the plaintiff has the burden of persuasion to prove by a preponderance of the evidence that the improper reason was the true reason." *Brock v. Casey Truck Sales, Inc.*, 839 F.2d 872, 876 (2d Cir. 1988) (citations and quotation marks omitted).

Like FLSA anti-retaliation claims, "[r]etaliation claims brought under . . . NYLL are generally governed by the same *McDonnell Douglas* burden-shifting framework as discrimination claims." *DeLuca v. Sirius XM Radio, Inc.*, No. 12 Civ. 8239 (CM), 2017 WL 3671038, at *23 (S.D.N.Y. Aug. 7, 2017); *see also Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 472 (S.D.N.Y. 2013) (applying the same standard for anti-retaliation claims brought under FLSA and NYLL); *Azeez v. Ramaiah*, No. 14 Civ. 5623 (PAE), 2015 WL 1637871, at *8 (S.D.N.Y. Apr. 9, 2015) (describing FLSA's anti-retaliation provision and NYLL's anti-retaliation provision as "closely analogous").

### III. DISCUSSION

Based on a review of the record, Suwanphanu has made a prima facie case that he was fired out of retaliation for his complaints about not being paid overtime. However, the hospital has presented a valid reason for his termination and Suwanphanu, after the benefit of discovery, has failed to create a genuine issue of material fact over whether that reason was pretext.

7

### A. The Prima Facie Case

To make a prima facie case of retaliation under the FLSA, Suwanphanu must show: "(1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010). Suwanphanu attempts to meet this bar by alleging that he was fired about a week after his last complaint regarding missing regular and overtime pay. These allegations, as supported by the record at summary judgment, are sufficient to create a prima facie case of retaliation.

Employees enjoy the protections of the FLSA's anti-retaliation provisions when they orally complain to an employer in a manner that makes the employees' invocation of a right under the statute plain. *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 115 (2d Cir. 2015). The complaint must have some degree of formality, however. For example, "a grumble in a hallway about an employer's payroll practice" is not sufficient. *Id.* Rather, the protection attaches "where the [employer] has been given fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns. *Id.* (quoting *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011)).

Here, Suwanphanu's multiple complaints to Oliver rise to the level of the formal complaint envisioned by *Greathouse*. He spoke with her at least three times regarding the discrepancies in his paychecks. On June 30, he complained specifically about not receiving overtime that he thought he was due. And in early June, he complained about missing a day's pay. This meeting prompted Oliver to take official action: she wrote on the June 4 paycheck that Suwanphanu would see an extra days' pay on his June 25 paycheck. He indeed received the extra money at the end of June, although its appearance confused him enough to prompt the

complaints about overtime. Such action shows that Suwanphanu's employer saw his complaints "as part of its business concerns."

The circumstances surrounding these conversations further indicate that Suwanphanu's concerns about his paycheck surpassed "grumbl[es] in the hallway." Several of these meetings took place in Oliver's office, and, on at least one occasion, Suwanphanu threatened to go to Oliver's superiors. Indeed, he elevated his complaints twice: he went to Guzman, Oliver's director, and then, when that bore no fruit, he went to the office of the hospital's president.

The hospital raises two arguments in response. First, it argues that the "errors" of which Suwanphanu complained did not amount to violations of the FLSA or the NYLL, and so complaining of them could not be interpreted to be invoking the anti-retaliation protections of those laws. Second, it argues that, in any event, Suwanphanu did not explicitly frame his complaints as violations of the law, and so those complaints do not rise to the level of a protected activity. Neither argument has merit.

First of all, the hospital *did* make a mistake in paying Suwanphanu that was not promptly fixed. As discussed in part I.A, *supra*, the hospital deducted 15 hours of sick pay collectively from his June 11 and June 25 paychecks after paying him only an extra 7.5 hours of sick pay on the June 4 paycheck. The hospital has not explained why it deducted a net of 7.5 hours of pay from Suwanphanu, and it has not indicated that he was ever made whole for this deduction. Indeed, the hospital has not moved for summary judgment on Suwanphanu's claims of unpaid regular wages, suggesting that there is at least an acknowledgement that there is a dispute of material fact on this issue.

Second, the FLSA's anti-retaliation provision is not limited to the protection of ultimately meritorious complaints; rather, the remedial purpose of the statute protects any employee who

9

engages in protected activity. *See Greathouse*, 784 F.3d at 113–14. As the *Greathouse* court explained, the purpose of the anti-retaliation provision is to encourage the informal resolution of employee grievances within a company by giving employees space to air grievances without the fear of being fired. *See id.* Limiting these protections only to instances where the employee is right would place the risk of mistakenly interpreting paychecks on the individual with the most to lose: the employee.

For much the same reason, this Court declines to rule in a manner that requires a complaining employee to *explicitly* invoke the text of a statute or the specter of illegality in order to enjoy the anti-retaliation provision's protection. *See also Dunn v. Sederakis*, 143 F. Supp. 3d 102, 113 (D. Conn. 2015) (declining to hold that an explicit invocation of statutory rights is necessary in FLSA anti-retaliation case). If the purpose of the FLSA is to allow employees to safely approach their employers and complain about missing wages or overtime, then requiring them to formally invoke a statutory provision or accuse their manager of breaking the law seems counterproductive. *See Greathouse*, 784 F.3d at 114.

Suwanphanu notified multiple members of management that he was owed regular wages and overtime, both rights guaranteed under the FLSA and NYLL. *See* 29 U.S.C. §§ 206(a), 207(a); N.Y. Lab. Law §§ 652. And, at first, his efforts succeeded: the hospital attempted to give him the regular wages he was owed and explain to him why he was not, in fact, owed overtime. This sequence of events contains both the "internal complaints" and "informal workplace grievance procedures" pictured by the *Greathouse* court. 784 F.3d at 114 (quoting *Kasten*, 563 U.S. at 14). He engaged in a protected activity.

With the protected activity being established, the other two elements for a prima facie case fall neatly into place. Suwanphanu indisputably suffered an adverse employment action

when he was terminated. *Quinn v. Green Tree Credit Corp.*, 759 F.3d 759, 769 (2d Cir. 1998). And there is at least a genuine issue of material fact over whether there is a causal connection between Suwanphanu's complaints and his termination since he was fired less than two months after his first complaint and it was the persons to whom he complained, Guzman and Oliver, that initiated the disciplinary proceedings that led to his discharge. *See White v. Dep't of Corr. Servs.*, 814 F. Supp. 2d 374, 389 (S.D.N.Y. 2011) ("A causal connection may be established . . . indirectly[] by showing that the protected activity was followed closely in time by the adverse action or by other circumstantial evidence."); *see also Hubbard v. Total Commc'ns, Inc.*, 347 F. App'x 679, 681 (2d Cir. 2009) (holding that a reasonable jury could find a prima facie case of causation when four months had elapsed between a protected activity and a termination).

### B. The Rationale for Suwanphanu's Termination

In response to Suwanphanu's prima facie case of retaliation, the hospital presents a legitimate rationale for firing Suwanphanu: he falsified hospital records by indicating he had completed a transport job when, in fact, he had not. *See Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 169 (2d Cir. 2001) ("[I]t is common sense and entirely lawful for an employer to select for termination an employee who the employer in good faith believes recently engaged in fraud relating to the employment.").

Sunwanphanu does not argue that this type of termination is illegitimate. Rather he proceeds to the third step of the *McDonnell Douglas* framework: proving that this legitimate basis for firing him is, in fact, pretext (or, more precisely in the context of opposing a motion for summary judgment, showing that there is a genuine dispute of material fact over whether the basis was pretext). He advances two arguments: first, that it is implausible that the hospital could have found he falsified records based on the evidence available; and second, that a comparison to other employees suggests that Suwanphanu's behavior did not merit termination.

11

Each of these arguments attempts to have the Court second-guess the business decisions of the hospital—something the Court may not do.

   1. *The Basis for the Hospital's Decision*

Employees who attempt to show pretext by questioning the soundness of their employers' termination decisions face a high hurdle. The Second Circuit has been quite clear that courts do not "sit as a super-personnel department that reexamines an entity's business decisions." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (internal quotation marks omitted). Instead, courts must focus their examination of a termination decision on "whether the articulated purpose [of the decision] is the actual purpose" rather than whether the decision was "unwise or unreasonable." *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170–71 (2d Cir. 1993).

Unfortunately for Suwanphanu, by arguing that the hospital made a poor or uninformed decision at the July fact-finding conference and the August grievance hearing, he is asking this Court to do precisely what the Second Circuit has forbid: focus on the wisdom of the hospital's decision. When examining the evidence before the hospital's fact-finders, the Court cannot conclude that the decision was implausible. Specifically, Suwanphanu admitted to Guzman at the July 2 fact-finding conference that he did not move a patient when he recorded in the TeleTracking that he had. And the hospital had a statement from a nursing assistant indicating that she had been moving the second patient from the eighth floor while Suwanphanu's TeleTracking entries indicate he was moving the patient from the tenth floor. This information supports the plausible inference that Suwanphanu had falsified hospital records.

Suwanphanu's attempt to rebut this evidence is unavailing. He relitigates his disciplinary hearings by questioning the credibility of the nursing assistant and by arguing over the proper interpretation of her testimony. He further points out that others in the hospital have publicly

expressed support for him and that the hospital has shown no reason why a long-time employee such as he would falsify records. And he notes that Guzman and Oliver seemed to have made up their minds to terminate Suwanphanu immediately after the fact-finding conference, before consulting with Human Resources. But these contentions simply challenge the accuracy and procedural fairness of the hospital's decision; the Court may not find for the plaintiff on this basis alone. *See Lu v. Chase Inv. Servs. Corp.*, 412 F. App'x 413, 417 (2d Cir. 2011) ("[T]he possibility that [the employer's decision] may have been erroneous does not, without evidence that it was a pretext for discrimination, satisfy [plaintiff's] burden under *McDonnell Douglas*."); *see also Kalra v. HSBC Bank USA, N.A.*, 567 F. Supp. 2d 385, 397 (E.D.N.Y. 2008) (holding that mere disagreement with an employer's decision, even with evidence that the decision was wrong, is not sufficient to demonstrate pretext) *aff'd* 360 F. App'x 214 (2d Cir. 2010).

2. *Comparators to Suwanphanu*

The plausibility of the hospital's decision is buttressed by two other patient transporters who were fired for falsifying records. The first employee accepted a transport job before arriving at work and never began transporting the patient. Defs.' SMF, Ex. C at Ex. 14. The second employee did not complete a transport job, but marked the job as complete. Defs.' SMF, Ex. C at Ex. 15. Both employees were cited for falsifying hospital records and were discharged. Like these employees, Suwanphanu was charged with not transporting a patient despite reporting that he had done so, suggesting the hospital's decision to fire him for falsification of hospital records was not without precedent.

Suwanphanu's efforts to negate these comparisons are unsuccessful. He points out that both individuals terminated had longer disciplinary records than Suwanphanu. That may be true — the first employee had habitually shown up late to work, and the second employee was observed to be sleeping on the job. Defs.' SMF, Ex. C at Exs. 14, 15. But Suwanphanu's

argument amounts to a plea for leniency given his long service at the hospital, the same as his other arguments on this point.  Unfortunately, even if the hospital's decision were ultimately "unwise or unreasonable," the Court may not second-guess its decision on that basis.  *See DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170–71 (2d Cir. 1993).

Suwanphanu's proffered comparators serve him no better.  He points to three patient transporters that did not follow proper TeleTracking procedures but were not suspended or terminated as a result.  The first and second employees transported a patient to the correct destination but improperly handed the patient off to a nurse or physician.  Pl.'s SMF Exs. A, B.  The third transporter marked a task as "In Progress" before he arrived at the pickup location, a violation of procedure.  Pl.'s SMF Ex. C.  All were given warnings only, and Suwanphanu contends that these comparisons show that the hospital's cited rationale for firing him was implausible.

Each of these individuals, however, share a crucial distinction from Suwanphanu:  they were not found to have falsified hospital records.  *See* Pl.'s SMF Exs. A, B, C.  Despite his contentions to the contrary, Suwanphanu's only proof is a series of hypothetical questions posed by his attorney during Guzman's deposition that alleged these employees had falsified records.  *See* Guzman Dep. 187–88, 189–90, 194–95.  If there were a factual basis for those allegations, Suwanphanu could have produced them in his moving papers.  He did not.  Therefore, these case studies are not helpful to the Court in determining the plausibility of the hospital's decision to fire Suwanphanu, and they are not sufficient to create a genuine dispute of material fact.  *See Ruiz v. Cty. of Rockland*, 609 F.3d 486, 494 (2d Cir. 2010) ("The comparator must be similarly situated to the plaintiff in all material respects." (internal quotation and citation removed)).

* * *

Without good comparators and having failed to present evidence that firing Suwanphanu was anything other than unreasonable or unwise, Suwanphanu fails to carry his burden to show that the hospital's decision to fire him due to his falsification of hospital records was a pretext. And because none of the facts contributing to this determination are in genuine dispute, the Court GRANTS the hospital's motion for summary judgment as to Suwanphanu's retaliation claims.

## IV.     UNPAID OVERTIME

The hospital additionally moves for summary judgment on the unpaid overtime claims. Suwanphanu admits that he did not work any overtime hours for which he was not paid. Suwanphanu Dep. 158:25–159:14. The 45 hours of regular pay on his June 25 paycheck are accounted for by the 37.5 hours of work he claims he worked and the additional 7.5 hours of regular pay Oliver indicated he would see after Suwanphanu complained of not being paid for a day on his June 4 paycheck. Accordingly — and because Suwanphanu does not contest this count in his moving papers — the Court GRANTS the hospital's motion as to any claims arising from allegedly unpaid overtime.

## V.     CONCLUSION

For the foregoing reasons, the Court GRANTS the hospital's motion for summary judgment and dismisses Counts I (unpaid overtime under FLSA), III (retaliation under FLSA), and Count IV (retaliation under NYLL) in their entirety. It also GRANTS the motion for summary judgment and dismisses Count II to the extent that Suwanphanu seeks unpaid overtime under the NYLL). All that remains for trial is the allegation that the hospital violated the New York Labor Law by failing to pay Suwanphanu for normal hours worked. The parties are ordered

to appear on **December 19, 2019 at 10:30 a.m.** for a status conference. The Clerk of Court is respectfully directed to remove the stay on this case and terminate the motion, Doc. 50.

It is SO ORDERED.

Dated: November 15, 2019
        New York, New York

_____
Edgardo Ramos, U.S.D.J.